MILTLAND RALEIGH–DURHAM,
Miltland Sacramento and Miltland
Chicago–Santa Fe, Plaintiffs,

v.

Michael H. MYERS, Myers Miltland Raleigh–Durham Limited Partnership, Myers Miltland Sacramento Limited Partnership, Chicago–Santa Fe Partnership and Myers Financial Group, Defendants.

No. 89 Civ. 1530 (CBM).

United States District Court,
S.D. New York.

Oct. 25, 1993.

Sutherland, Asbill & Brennan, New York City, for plaintiffs (Michael J. Levin, of counsel).

Merkin & Hemme, LaJolla, CA, for defendants (Donald Merkin, of counsel).

## OPINION

MOTLEY, District Judge.

### BACKGROUND.

Plaintiffs, Miltland Raleigh–Durham, Miltland Sacramento and Miltland Chicago–Santa

Fe, asserted claims against defendants Michael Myers and Myers Financial Group (the "Myers Defendants"), and asserted derivative claims against the Myers Defendants on behalf of defendants Myers Miltland Raleigh–Durham Limited Partnership, Myers Miltland Sacramento Limited Partnership and Chicago–Santa Fe Partnership (the "Limited Partnerships"). All claims alleged civil RICO violations, securities fraud under § 10(b) and Rule 10(b)–5, common law fraud and breach of fiduciary duty. The case was tried before the court on November 4 through 15, 1991.

The court, in an opinion dated August 26, 1992, found the Myers Defendants liable for civil violations of RICO, securities fraud, common law fraud and breach of fiduciary duty. 807 F.Supp. 1025. The court then, in its order dated May 24, 1993, awarded Plaintiffs damages, attorneys' fees, and equitable relief by 1) permanently enjoining Myers and Myers Financial from further wrongful acts, 2) removing Myers as general partner of the Raleigh–Durham and the Sacramento Limited Partnerships and authorizing the limited partners of such partnerships to appoint a substitute general partner for each partnership while specifically requiring Myers' cooperation, 3) removing Myers Financial as general partner of Chicago–Santa Fe Partnership, 4) requiring an accounting by Myers of his conduct as a general partner of the Raleigh–Durham and the Sacramento Limited Partnerships and by Myers Financial for Myers Financial's conduct as a general partner of the Chicago–Santa Fe Partnership, 5) imposing equitable liens on Myers' interests in the Raleigh–Durham and Sacramento Limited Partnerships and on Myers Financial's interests in the Chicago–Santa Fe Partnership, and 6) imposing constructive trusts on the assets of the Raleigh–Durham and Sacramento Limited Partnerships and the Chicago–Santa Fe Partnership in order to protect Plaintiffs' investments.

Plaintiff Miltland Raleigh–Durham was awarded judgment for compensatory damages in the amount of $383,962 with interest at the rate of 9% per annum from June 10, 1985, the closing date of the purchase of property of Myers Miltland Raleigh–Durham Limited Partnership, to the entry of judgment.

Plaintiff Miltland Sacramento was awarded judgment for compensatory damages in the amount of $114,425.50 with an interest rate of 9% per annum from May 10, 1985, the date Myers received the benefit of such amount, to entry of judgment.

The court additionally entered judgment for the Limited Partnerships on the derivative actions asserted on their behalf against the Myers Defendants for civil RICO violations, securities fraud, common law fraud and breach of fiduciary duty.

The Chicago–Santa Fe Partnership was awarded compensatory damages for fraud and fraud in breach of fiduciary duty in the amount of $308,014.92 with an annual interest rate of 9% from December 11, 1986, the date Myers received such amount, to the entry of judgment. Plaintiff (and limited partner) Miltland Chicago–Santa Fe was awarded $104,725.07 with an interest rate of 9% per annum from December 11, 1986 to the date of entry of judgment as its 34% share of the $308,014.92 commission.

The Chicago–Santa Fe Partnership also received compensatory damages in the amount of $108,569 with an annual interest rate of 9% from December 15, 1986, the date Myers received such amount, to the entry of judgment. As a result of Defendants' diversion of these partnership funds, Miltland Chicago–Santa Fe was awarded an additional $36,913.46, with a 9% annual interest rate, as its 34% share of the diverted funds.

The Chicago–Santa Fe Partnership was awarded $32,828 for the wrongful failure of Myers Financial to make a capital contribution in that amount, from December 6, 1986, the date Myers Financial failed to contribute, to the date of the entry of judgment. Limited partner Miltland Chicago–Santa Fe was awarded $11,168.32, with an annual interest rate of 9%, as its 34% share.

Judgment was entered for the Chicago–Santa Fe Partnership against the Myers Defendants for improper charges to the partnership of $145,000 for settlement of the Grant suit against Myers, $50,000 for a purported consulting fee in connection with such

settlement, $41,000 for legal fees of Myers' counsel and finally $63,300 for the Landvest Real Estate Group's 1990 expenses.

The court denied Defendants' post-trial motions to strike parol evidence, evidence of events which occurred after the amended complaint was filed and evidence admitted subject to proof of conspiracy.

The court ordered that Plaintiffs and the Limited Partnerships were entitled to attorneys' fees and punitive damages due to the intentional, willful and malicious fraud in breach of fiduciary duty of the Myers Defendants. An evidentiary hearing on damages and fees was held on September 30, 1993. At that time, Defendants requested that the court additionally consider not awarding pre-judgment interest on RICO damages. Pursuant to this hearing, the court makes the following determinations.

## DISCUSSION.

1. *Attorneys' Fees.*

a. *Calculation of Attorneys' Fees.*

Plaintiff was awarded attorneys' fees plus costs pursuant to this court's opinion, dated August 26, 1992, and order, dated May 24, 1993. The court now addresses the issue of the amount of attorneys' fees to be awarded.

■ It is within the district court's discretion to determine the amount of a fee award. *U.S. Football League v. National Football League,* 887 F.2d 408, 415 (2d Cir.1989) *cert. denied* 493 U.S. 1071, 110 S.Ct. 1116, 107 L.Ed.2d 1022 (1990) (citing *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983)). "Having tried the case, the District Court has the vantage point from which to assess the skill of the attorneys and the amount of time reasonably needed to litigate a case." *Chambless v. Masters, Mates & Pilots Pension Plan,* 885 F.2d 1053, 1057–8 (2d Cir.1989) *cert. denied,* 496 U.S. 905, 110 S.Ct. 2587, 110 L.Ed.2d 268 (1990); *accord U.S. Football League v. National Football League,* 887 F.2d at 415; *Ortiz v. Regan,* 980 F.2d 138, 141 (2d Cir.1992).

■ "In determining the amount of the award, a 'lodestar' figure is set by 'multiplying the hours spent on a case by a reasonable hourly rate of compensation for each attorney involved.'" *U.S. Football League v. National Football League,* 887 F.2d at 413 (quoting *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 563, 106 S.Ct. 3088, 3097, 92 L.Ed.2d 439 (1986)); *Blum v. Stenson,* 465 U.S. 886, 888, 104 S.Ct. 1541, 1544, 79 L.Ed.2d 891 (1984); *Hensley v. Eckerhart,* 461 U.S. at 433, 103 S.Ct. at 1939. A "reasonable hourly rate" is the rate charged by attorneys of like skill and experience, located in the same region, for comparable work. *New York State Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1140 (2d Cir.1983); *In re Agent Orange Product Liability Litig.,* 611 F.Supp. 1296, 1324 (S.D.N.Y.1985), *aff'd in pertinent part,* 818 F.2d 226 (2d Cir.1987). This process of calculation and adjustment of the lodestar figure is applied in RICO cases. *See Nu-life Const. v. Bd. of Educ. of City or New York,* 795 F.Supp. 602, 605 (S.D.N.Y. 1992).

1) *Inclusion of the Bankruptcy Litigation Fees in the Lodestar.*

■ Defendants argue that Plaintiffs should not recover fees incurred in the United States Bankruptcy Courts for the Central District of California and the District of Idaho. Plaintiffs sought relief in these courts because Defendants Myers and Myers Financial each filed bankruptcy petitions while the present case was pending. Plaintiffs, in order to continue with the prosecution of this case, were obligated to go to the these courts in order to get the automatic stays imposed under § 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a) lifted.

First, on February 19, 1992, Mr. Myers filed a petition under Chapter 7 of the Bankruptcy Code. Plaintiffs were successful with their motion to lift the stay as against Mr. Myers and were allowed to proceed against him due to the Central District of California bankruptcy court's finding that his debts to Plaintiffs were non-dischargeable pursuant to § 523(a) of the Bankruptcy Code, 11 U.S.C. § 523(a), due to his fraudulent conduct and breach of fiduciary duty.

Subsequently, Myers Financial filed a voluntary petition under Chapter 11 of the

Bankruptcy Code and again stayed the proceeding. On April 5, 1993, the Idaho Bankruptcy Court issued an order granting Plaintiffs' motion to modify the automatic stay to allow this action to proceed to judgment.

Both of these actions were necessary in order for Plaintiffs to successfully prosecute their case through judgment. Accordingly, the court finds it proper to include such fees incurred in the bankruptcy litigations in the award of attorneys' fees.

### 2) *The Calculation of Post-trial Expenses.*

Defendants argue that the post-trial fees that Plaintiffs are claiming are excessive and request that the court "demand a further justification for what appears to be higher than normal bills by attorneys not of record in this Court." (Defendants' Memorandum in Opposition to Plaintiffs' Application for Attorneys Fees at 4.)

■ However, Plaintiffs have set forth the amount of attorneys' fees being requested, including post-trial fees and expenses, in an affidavit sworn to by Michael J. Levin and in the detailed contemporaneously made time records submitted to the court. The court finds these documents to be adequate justification for the requested post-trial expenses. Accordingly, these expenses, as originally calculated, have been properly included in the lodestar figure.

### 3) *The Award of Out-of-Pocket Expenses.*

■ Plaintiffs have included out-of-pocket expenses in their fee application. Attorneys may be compensated for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they "were incidental and necessary to the representation" of those clients. *Reichman v. Bonsignore, Brignati & Mazzotta, P.C.,* 818 F.2d 278, 283 (2d Cir.1987) (quoting *Northcross v. Board of Education,* 611 F.2d 624, 639 (6th Cir.1979)). Accordingly, the inclusion of disbursements in the fee award is appropriate.

### 4) *Compensation for Paralegal Time.*

■ Plaintiffs additionally included paralegal time in their fee calculation. "[A] 'reasonable attorney's fee' cannot have been meant to compensate only work performed personally by members of the bar. Rather, the term must refer to a reasonable fee for the work product of the attorney." *Missouri v. Jenkins,* 491 U.S. 274, 285, 109 S.Ct. 2463, 2470, 105 L.Ed.2d 229 (1989). Therefore, "the 'reasonable attorney's fee' ... should compensate the work of paralegals, as well as that of attorneys." *Id.* Therefore, it is appropriate to include such paralegal expenses in the calculation of attorneys' fees.

### b. *Adjustment of the Lodestar Amount.*

Both Plaintiffs and Defendants argue for adjustments of the calculated lodestar amount. "The lodestar figure may be adjusted upward or downward, however, there is '[a] strong presumption that the lodestar figure ... represents a 'reasonable' fee.'" *U.S. Football League v. National Football League,* 887 F.2d at 413 (quoting *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. at 565, 106 S.Ct. at 3098).

The Supreme Court noted in *Hensley,* that a district court, when adjusting the lodestar, may consider the factors identified in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974). *Hensley v. Eckerhart,* 461 U.S. at 434 n. 9, 103 S.Ct. at 1940 n. 9. The *Johnson* factors that may be considered are 1) the time and labor required; 2) the novelty and difficulty of the questions; 3) the skill requisite to perform the legal service properly; 4) the preclusion of other employment by the attorney due to acceptance of the case; 5) the customary fee; 6) whether the fee is fixed or contingent; 7) time limitations imposed by the client or the circumstances; 8) the amount involved and the results obtained; 9) the experience, reputation and ability of the attorneys; 10) the "undesirability" of the case; 11) the nature and length of the professional relationship with the client; and 12) awards in similar cases. *Id.*

The Supreme Court additionally noted that the district court should be aware that many of the *Johnson* factors are "usually subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." *Id.*

■ The burden of establishing entitlement to an increase or a decrease in the lodestar is on the party advocating such an adjustment. *U.S. Football League v. National League,* 887 F.2d at 413. Plaintiffs argue that the lodestar, due to the complexity of the litigation, should be increased by a factor of 1.2. Plaintiffs note that they were required to engage in "time consuming and difficult investigation and discovery into a wide-ranging and complicated land fraud," due to the extent of the Myers Defendants' fraud, and that "the case and trial, involved extremely complex issues of law and fact." (Affidavit in support of Plaintiffs' Application for Attorneys' Fees ¶ 28.)

■ It is true that Plaintiffs were required to travel, rather extensively, in order to complete all discovery. They also dealt with the relatively complex legal issues involved in civil RICO claims, securities fraud claims and breaches of fiduciary duties. However, these facts do not prove an entitlement to an increase in fees.

The difficulty encountered in such a case is generally reflected in the hours spent preparing for and litigating the action. Similarly, while Plaintiffs' counsel were skilled and experienced attorneys, their expertise was reflected and rewarded by their entitlement to charge higher hourly fees. The court finds that Plaintiffs would be adequately compensated by the original lodestar amount. Accordingly, the 1.2 factor will not be applied.

■ Defendants, on the other hand, suggest that the lodestar figure should be reduced by a factor of .8. Defendants essentially argue that the fees requested by Plaintiffs are excessive for this type of action. However, Defendants have not stated any reasons that would justify a reduction in the fee amount. Defendants make the statement that,

$900,000+ for a case like this boggles the mind. Whether Plaintiffs' counsel actually spent the thousands of hours that are listed is not the point. There are other reasons that one can infer which would explain the thousands of hours of time spent—not the least of which is that these lawyers were chasing their own money.

(Defendants' Memorandum in Opposition to Plaintiffs' Application for Attorneys' Fees at 3.)

This is not reasoning which would induce this court, in its discretion, to reduce the lodestar amount. One instance where courts have been inclined to reduce the fee award is where the Plaintiffs have had only limited success on their claims. In *Hensley,* the Supreme Court noted that where "a plaintiff has achieved only partial or limited success," fully compensating counsel would be excessive. *Hensley v. Eckerhart,* 461 U.S. at 436, 103 S.Ct. at 1941. Plaintiffs, in the instant case, succeeded on all claims despite Mr. Myers' extensive fraud. Accordingly, the court declines to employ a factor of .8 to reduce the lodestar figure.

Neither Plaintiffs nor Defendants have met the burden of showing that an increase or a decrease in the lodestar is warranted. Therefore, the court will not apply either adjustment factor to the original lodestar figure and grants attorneys' fees in the amount of $684,850.07 and $117,697.67 in disbursements.

## 2. *Punitive Damages.*

The Plaintiffs were awarded punitive damages. The court will now address the question of the amount of punitive damages to be granted.

■ When awarding punitive damages, the award should not be in an amount that would result in the financial ruin of the defendant. *Vasbinder v. Scott,* 976 F.2d 118, 121 (2d Cir.1992); *Smith v. Lightening Bolt Productions, Inc.,* 861 F.2d 363, 373 (2d Cir. 1988). "Nor should it constitute a disproportionately large percentage of a defendant's net worth." *Vasbinder v. Scott,* 976 F.2d at 121. " '[E]ven outrageous conduct will not support an oppressive or patently excessive award of damages.' " *Id.* (quoting *Brink's Inc. v. City of New York,* 546 F.Supp. 403, 413–14 (S.D.N.Y.1982) (quoting *Herman v. Hess Oil V.I. Corp.,* 379 F.Supp. 1268, 1276 (D.V.I.1974), *aff'd,* 524 F.2d 767 (3d Cir. 1975)), *aff'd,* 717 F.2d 700 (2d Cir.1983)). The burden is on the defendant to show "that

his financial circumstances [are such that would] warrant a limitation of the award." *Smith v. Lightening Bolt Productions, Inc.,* 861 F.2d at 373 (citing *Zarcone v. Perry,* 572 F.2d 52, 57 (2d Cir.1978)).

■ At the September 30 hearing, Plaintiffs argued that despite his on-going proceeding under Chapter 7 of the Bankruptcy Code, Mr. Myers has substantial assets which would allow for an award of some punitive damages. (R. at 11.) Plaintiffs claim that due to Mr. Myers' discharge of liabilities under Chapter 7 and, due to a certain asset Mr. Myers failed to claim in the bankruptcy proceeding, he still has the financial ability to pay some amount in punitive damages.

In support of their assertion that Mr. Myers has undisclosed assets, Plaintiffs introduced into evidence, among other documents, the Certificate of Limited Partnership of Prospector Road Limited Partnership (the "Certificate"), the Limited Partnership Agreement of Prospector Road Limited Partnership, (the "Partnership Agreement"), and the Revocable Trust Agreement of the Sun Valley Trust, (the "Sun Valley Trust Agreement").

The Certificate states that the Partnership's purpose and general character is to acquire, own and operate "for income producing purposes and for long term capital appreciation investment," property located at 200 Prospector Road, Sun Valley, Idaho. (Cert. ¶ 2.) Charles W. Baumgardner is the named general partner and the Sun Valley Trust, Mr. Baumgardner and the Children's Sun Valley Trust are named as the limited partners. (Cert. ¶ 4.) The Sun Valley Trust was required to contribute the property, which, at the time, had a net equity value of $525,000, to the partnership. (Cert. ¶ 5.)

The Partnership capital is divided into 100,000 Class A Units and 100,000 Class B Units. (Cert. ¶ 9; Limited Partnership Agreement ¶ 5.01.) The holders of such Units are to receive any cash from operations that becomes available for distribution with a distribution preference given to holders of the Class A Units. (Cert. ¶ 9b; Limited Partnership Agreement ¶ 7.04B.) The Sun Valley Trust, as a limited partner in the Prospector Road Limited Partnership, has been allocated 30,000 Class A Units. (Limited Partnership Agreement, Sched. 1.)

The Sun Valley Trust Agreement, entered into on August 24, 1984 by Mr. Myers as grantor and Mr. Baumgardner as trustee, names Mr. Myers as the designated beneficiary of the trust agreement. (Sun Valley Trust Agreement at 2.) Article III of the Sun Valley Trust Agreement provides in part that,

> [d]uring the Grantor's lifetime, the Trust Estate shall be held, administered and distributed by the Trustee as follows: A. The Trustee shall pay to or apply for the benefit of the Grantor, quarter-annually or at more frequent intervals, the entire net income from the Trust Estate. B. The Trustee shall also pay to or apply for the benefits of the Grantor such sums from the principal of the Trust Estate as the Grantor may, from time to time, request in writing.

(Sun Valley Trust Agreement at 2.)

The trust estate includes the 30,000 Class A Units of Prospector Road Limited Partnership. (Sun Valley Trust Agreement Sched. A.) The court finds that these three documents sufficiently establish that Mr. Myers has some interest in the property located at 200 Prospector Road.

Given that Mr. Myers did not declare this interest in his bankruptcy action, and given that Mr. Myers engaged in extensive fraud in his dealings with Plaintiffs, this court is not hard pressed to find that Mr. Myers was indeed hiding this particular asset and may in fact be hiding other assets. Accordingly, the court finds that Mr. Myers has the ability to pay some amount of punitive damages.

However, it is difficult to ascertain the value of Mr. Myers' assets. Mr. Myers resides in the house located at 200 Prospector Road. He testified at the Myers Financial Chapter 11 proceeding, that the house was appraised at a value of $2,950,000 approximately two years ago. (R. at 14–15.) At the September 30 hearing, Defendants' counsel noted that the property in question, much to

the surprise of Plaintiffs' counsel, has been sold. (R. at 29.)

If the house was indeed sold, according to the provisions of the Limited Partnership Agreement and the Sun Valley Trust Agreement, Mr. Myers should have received a distribution. Unfortunately, the court is left without any knowledge as to the amount for which the house was sold or what Mr. Myers actually received as a distribution of the sale proceeds.

Therefore, due to the lack of evidence before it concerning Mr. Myers' assets, the court will reserve judgment on this issue and, after allowing Plaintiffs a reasonable period of time for discovery on this issue, require Mr. Myers to appear before this court and testify as to his financial situation.

3. *Prejudgment Interest on RICO Judgments.*

■ Defendants request that the court consider not awarding prejudgment interest on the Plaintiffs' RICO recoveries. "Since the RICO statute does not contain any provisions concerning the award of prejudgment interest, the district court ha[s] discretion as to whether to award such interest." *Abou–Khadra v. Mahshie,* 4 F.3d 1071, 1084 (2d Cir.1993); *see also Wickham Contracting Co. v. Local Union No. 3, IBEW,* 955 F.2d 831, 835 (2d Cir.1992) (When a statute is silent, it is within the court's discretion whether or not to award prejudgment interest). An award of prejudgment interest should not result in the overcompensation of the wronged party. *Wickham Contracting Co. v. Local Union No. 3,* 955 F.2d at 834. As the *Wickham* court stated,

> [T]he [prejudgment] award should be a function of (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court.

*Id.* (citations omitted).

Two courts in this Circuit have suggested that such interest should not be available on RICO judgments. In *Nu–Life Construction v. Board of Education,* 789 F.Supp. 103 (E.D.N.Y.1992), the court denied prejudgment interest on a RICO claim stating that such interest was "unnecessary to fairly compensate a successful plaintiff." *Id.* at 105.

The court in *Nu–Life* followed the reasoning of the Second Circuit in *Trans World Airlines, Inc. v. Hughes,* 449 F.2d 51, 80 (2d Cir.1971), *rev'd on other grounds,* 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973), where the court found that treble damages awarded under the Clayton Act were sufficient compensation, making prejudgment interest unnecessary. *Nu–Life Construction v. Board of Education,* 789 F.Supp. at 105. The Second Circuit stated that "[i]t is reasonable to interpret Congress's silence on the matter as indicating that trebled damages are sufficient penalty and that interest need not be included." *Trans World Airlines, Inc. v. Hughes,* 449 F.2d at 80. The *Nu–Life* court applied this holding to the trebling of damages under RICO. *Nu–Life Construction v. Board of Education,* 789 F.Supp. at 105.

Similarly, the court in *Bingham v. Zolt,* 810 F.Supp. 100 (S.D.N.Y.1993), asserted that "[w]here, as in this case, the Court trebles damages pursuant to the RICO statute (18 U.S.C. § 1964(c)), awarding prejudgment interest will probably be unnecessary; treble damages will usually more than adequately compensate a plaintiff for actual damages suffered." *Id.* at 102. The *Bingham* court went on to note that "exceptional circumstances may exist—specifically, where treble damages do not adequately compensate a plaintiff for the actual damages suffered, or where a defendant has sought unreasonably and unfairly to delay or obstruct the course of litigation—warranting the imposition of prejudgment interest on a RICO judgment." *Id.*

■ Defendants did unreasonably and unfairly delay and obstruct the course of litigation. On February 19, 1992, after trial, but before the entry of judgment, Defendant Myers filed a voluntary petition under Chapter 7 of the Bankruptcy Code and stayed this court from continuing with this action. Plaintiffs successfully obtained an order from the Bankruptcy Court modifying the stay to allow this action to proceed to judgment.

Then, the day before this court was to enter the proposed order implementing its August 1992 opinion, Myers Financial filed a petition under Chapter 11 and for a second time stayed the court from entering a judgment. In both cases, the automatic stays were modified to allow this action to proceed to judgment. The court finds that the Myers Defendants filed these petitions and timed the filings of these petitions with the intention of delaying this court from proceeding. Therefore, Defendants are required to pay prejudgment interest on the RICO claims for the time period running from February 19, 1992, the date Mr. Myers filed his Chapter 7 petition, through April 5, 1993, the date that the second automatic stay was modified.

### CONCLUSION.

Defendants are to pay attorneys' fees in the amount of $684,850.07 and $117,697.67 in disbursements. Defendants are additionally ordered to pay prejudgment interest on the RICO claims for the period starting on February 19, 1992 and ending on April 5, 1993 at the prevailing average prime interest rate during said period.

The court reserves judgment on the issue of punitive damages. Plaintiffs will have sixty days from the date of this Opinion and accompanying Order for further discovery on the issue of whether Myers can pay punitive damages. Defendant Myers is ordered to appear before this court thirty days thereafter so that Plaintiffs and Defendant Myers can present testimony and other evidence concerning Mr. Myers' financial circumstances and ability to pay punitive damages.