**In re TEXACO, INC. SHAREHOLDER LITIGATION.**

No. 96 Civ. 8343(CLB).

United States District Court, S.D. New York.

Sept. 15, 1998.

*MEMORANDUM & ORDER*

BRIEANT, District Judge.

By order dated April 23, 1998, this Court appointed Charles G. Moerdler, Esq. as a Special Master, pursuant to Fed.R.Civ.Pro. 53, to hear the application of plaintiffs' counsel for reasonable legal fees for services rendered in the prosecution and settlement of this shareholder derivative action. By Report, dated June 26, 1998, and filed July 6, 1998, the Special Master recommended that plaintiffs counsel's request for $1.4 million dollars in fees and costs be reduced to $1 million dollars and allowed in that amount. Familiarity of the reader with all prior proceedings in this case is assumed, including familiarity with the Report itself and the documents therein referred to.

■ Presently before the Court for resolution are plaintiffs' counsel's objections to the Report, and the objections of various Texaco shareholders. This Court in reviewing objections to the Report of a Special Master does not substitute its own judgment and discretion for that of the Special Master. The only issue is that set forth in Rule 53(e)(2) F.R.Civ.P.: Are the Special Master's findings clearly erroneous? This Court concludes that they are not. Our Court of Appeals has held that a district judge "must accept the Master's findings of fact unless they are clearly erroneous." *Collins v. Foreman,* 729 F.2d 108, 118 (2d Cir.1984). For the reasons set forth below, this Court concludes that the resolution of the amount of fees and costs to

be awarded to plaintiff's counsel was valid in light of all of the relevant circumstances.

## Discussion

### A. The Benefits Conferred by the Settlement Agreement

The Settlement Agreement in this case provided: (1) that shareholders may request and receive a copy of the public portion of the Task Force's Annual Report to the Court prepared pursuant to the settlement of the *Roberts* Action, by writing to, sending an e-mail to, or calling a toll free number at Texaco; and (2) that Texaco would incorporate the terms of its "Statement of Equality and Fairness Objectives"—initially applicable only to certain employees—into any new contracts Texaco enters into with outside vendors. After examining the quality of the benefit achieved by the Settlement Agreement, the Special Master concluded that while plaintiff's request of $1.4 million reflecting a contingency risk multiplier of 2.15 of the lodestar of $667,736.55 was not justified, the settlement's benefits were sufficiently "substantial for the stockholders" to justify a multiplier of approximately 1.5 and an aggregate award of $1 million. *See* Report at 31.

### B. Shareholder Objections

Elizabeth McLaughlin, who owns 200 shares of Texaco stock, filed an objection to the Report of the Special Master, through her attorney, Joseph McLaughlin, Esq., on July 15, 1998. Essentially, Ms. McLaughlin protests that the emperor's splendid new clothes are in fact no clothes at all.[1] She claims that the substantive benefits created by the Settlement Agreement are "illusory," that the Special Master's award of $1 million in fees and costs was inappropriate, and that such fees and costs should be reduced to an amount "substantially below plaintiffs counsel's claimed 'lodestar' of $667,736.55 (including expenses)." *See* Doc. No 78 at 3–4. With respect to the increased access to the Task Force Report provided by the Settlement Agreement, Ms. McLaughlin complains that that Annual Report is widely available over the internet anyway, and that many interested persons can obtain a copy of it "at a few keystrokes." *See* Doc. 78 at 2. Yet, even in this "wired" age, many interested persons do not have access to the internet, and are therefore beneficiaries of Texaco's commitment to make available—through telephone or correspondence contact—the Task Force's Annual Report. As the Special Master found, by increasing the availability of the Task Force Report, the Settlement Agreement has further advanced "the underlying purposes sought to be achieved in the seminal Roberts Settlement Agreement—*i.e.* to advance the proper interests of the company and its shareholders, as well as sound public policy." *See* Report at 29. The Court finds no basis to reject this finding.

Ms. McLaughlin also argues that "it defies imagination that the proposed statement in the vendor contracts would influence Texaco's future behavior to any material extent when one considers the much more potent incentives furnished by Texaco's experiences with adverse publicity and discrimination litigation." *See* Doc. 78 at 3. She challenges the Special Master's conclusion that through the Settlement Agreement, Texaco has obliged itself to police its vendors' compliance with Texaco's equality objectives, and states that "[i]f there is any doubt on this score, I suggest that the Court invite Texaco to state whether it agrees with the Report's characterization of its undertaking." *Id.*

Ms. McLaughlin apparently overlooks the fact that the Special Master extended precisely such an invitation to Texaco by asking Dennis J. Block, Esq., Texaco's counsel, whether the corporation's directors and officers could be subject to a shareholder derivative suit should the corporation fail to live up to its obligation to police its vendors. *See* Doc. No. 70, Letter from Dennis J. Block, Esq. to Special Master Charles G. Moerdler, dated May 19, 1998. Mr. Block responded with an unambiguous "yes." *Id.* In light of this fact, the Special Master concluded that by incorporating the statement into its vendors' contracts, and conceding the power of

1. *See* Hans Christian Andersen, *The Emperor's New Suit,* reprinted in *The Complete Hans Christian Andersen Fairy Tales,* (2d ed. 1993 Grammercy Books).

shareholders to seek its vindication by means of a derivative claim, the Settlement Agreement "added another dimension to Texaco's committed efforts to provide the fullest possible environment of inclusion both directly, and, insofar as relations with affected vendors are concerned, indirectly." *See* Report at 30. This Court agrees, and concludes that the Special Master was not clearly erroneous in determining that the Settlement Agreement provided a real benefit and that for the reasons stated in the Report a multiplier of 1.5 was appropriate in light of that real benefit.

An objection to the Report was also filed by Glendora. A frequent *pro se* litigant in this Court and elsewhere, Glendora owns one (1) share of stock of Texaco, Inc.[2] She attended the hearing before the Special Master and made written submissions, which are part of the record. Her objection consists of fifty-two pages of handwritten comments interspersed with copies of pages of other documents upon which Glendora has written comments as interlineations or in the margin. *See* Doc. 70 *passim*. Essentially, this document expresses Glendora's belief that the fee should be zero, and announces her intention to appeal the award of any fee. *See* Doc. 70 at 45, 49. Glendora objects to the fact that Texaco—having previously stipulated to a maximum fee exposure in the case—did not appear at the hearing before the Special Master, and that no persons were placed under oath at the hearing. She also makes the disassociated contention that after com-

mitting to adhere strictly to the letter and spirit of the anti-discriminations laws, Texaco's executives "[t]hen ... go and bust NYS BCL [*inter alia*] § 624[and] § 718." *Id.* at 21. This grievance refers to Texaco's obligations under sections 624 and 718 of the New York Business Corporation Law ("BCL"), which confer upon shareholders, including Glendora, the qualified right to inspect a corporation's books, and to obtain a list of a corporation's officers and directors and their home addresses. N.Y.Bus.Corp. Law §§ 624, 718 (McKinney 1997).[3] The remainder of Glendora's contentions are just her usual chaff of the sort asserted in many other cases, which the Court declines to discuss. *See* Slip Opinion at 1, Doc. No. 198 in *Glendora v. Cablevision et al.*, 93 Civ. 8344 (June 26, 1998) (finding that Glendora has become "a litigation abuser"). The Court finds nothing in Glendora's submission which would cause it to reject the Report of the Special Master.

In sum, the Court has considered the shareholder objections to the Report and has concluded that none articulate a justification for rejecting the Special Master's findings.

## C. Plaintiffs Counsels' Objections

Plaintiffs' counsel have also filed an objection to the Special Master's Report. Many of the substantive objections made by plaintiffs counsel are anticipated fully by the Special Master's Report, and need not be discussed. Instead, the Court will limit this

---

**2.** With respect to Glendora's in forma pauperis status, the tide has apparently turned, based on the recent discovery that as of 1991 Glendora had $91,000 in a savings account, which at some point she transferred to her husband Franklyn's account, and which has since disappeared. *See* Slip Opinion, dated January 20, 1998 in *Glendora v. The Board of Directors of Cablevision et al.*, Index No. 17195/97, (Supreme Ct., Westchester Co.1998) (DiBlasi, J.S.C.).

**3.** At the Special Master's May 14, 1998 hearing on the issue of attorney's fees, Glendora spent some considerable time describing a lawsuit she claims to have brought against Texaco to enforce her "rights" under BCL sections 624 and 718 to review Texaco's "books, records and minutes and the home addresses." *See* Tr. at 56, Doc. 66. According to Glendora: "I have my reasons for wanting the home addresses." *See id.* Appar-

ently, such reasons have impelled Glendora to litigate this issue frequently against various other corporate entities, including the Cablevision and U.S. West corporations. *See e.g.*, Slip Opinion at 4–5, dated March 6, 1998 in *Glendora v. Richard D. McCormick, U.S. West et al.*, Index No. 7556/97, (Supreme Ct., Westchester Co.1998) (Cowhey, J.S.C.) (dismissing Glendora's BCL claim, and sanctioning her $100.00 "for engaging in frivolous conduct.") and *Glendora, Shareholder v. The Board of Directors of Cablevision et al.*, Docket No. 96–CV–6369 (E.D.N.Y.1997) (Ross, J.). The Court notes that because Texaco is incorporated in Delaware, rather than in New York, to the extent that Glendora is entitled to the information she seeks, it is by reason of BCL § 1315 rather than § 624 or § 718. *See Crane Co. v. Anaconda Co.*, 39 N.Y.2d 14, 382 N.Y.S.2d 707, 709 n. 3, 346 N.E.2d 507 (1976).

discussion to plaintiffs' counsel's two principal points.

Counsel argue first that in reducing their requested aggregate fee to $1,000.000, the Special Master discounted "a very important consideration." According to counsel, the Special Master:

> disregards as unpersuasive the fact that the non-economic advantages are heightened because the insurer and not Texaco will pay the fee award. Report at 30. This reasoning is flawed. Not only will Texaco benefit from the settlement, but it will obtain this obtain this benefit at no cost to itself.

*See* Plaintiffs' Counsel's Mem. at 7.[4]

The Court agrees with the Special Master that counsel's reasoning in this regard "is unpersuasive." *See* Report at 30 n. 30. It is true that defense counsel did represent to the Special Master that "Texaco recently renewed its [Directors and Officers insurance] policy in a relatively soft market in exchange for the same premium it previously had been paying." *See* Doc. No. 70, Letter from Dennis J. Block, Esq. to Special Master Charles G. Moerdler, dated May 19, 1998. However, plaintiffs' counsel's contention that the benefits conferred by the settlement were obtained *"at no cost "* to Texaco is predicated on the unfounded assumption that Texaco's insurance premiums would not have been reduced absent this lawsuit, or, alternatively, some idea that insurance payments are "something for nothing." Whenever insurers pay, there is an economic and social cost, imposed upon and spread across the entire economy. As stated by the Supreme Court:

> The effect of insurance—indeed, it has been said to be its fundamental object—is to distribute the loss over as wide an area as possible. In other words, the loss is spread over the country, the disaster to an individual is shared by many, the disaster to a community shared by other communities; great catastrophes are thereby lessened, and, it may be, repaired. In assimilation of insurance to a tax, the companies have been said to be the mere machinery by which the inevitable losses are distributed so as to fall as lightly as possible on the public at large, the body of the insured, not the companies, paying the tax.

*German Alliance Ins. Co. v. Lewis,* 233 U.S. 389, 412, 34 S.Ct. 612, 58 L.Ed. 1011 (1914).

Even assuming that Texaco will never incur additional direct costs in respect of future premiums as a result of the settlement of this action, plaintiffs are not prevailing parties simply because this settlement fits favorably within an insurer's underwriting constructs. Instead, plaintiffs prevailed by securing Texaco's agreement to provide wider access to the Task Force Report and to place and police reasonably the "Equality and Fairness Objectives" in vendors' contracts. The fee recommended by the Special Master for plaintiffs' success in that regard exceeds the lodestar and is entirely reasonable. Accordingly, it is adopted by the Court.

Plaintiffs counsel also complain that the Special Master's recommendation does not allow them compensation for their efforts in "subsequent proceedings." *See* Plaintiffs' Counsel's Mem. at 7. The Special Master quite clearly considered the costs and expenses customarily associated with such efforts to wind down a litigation and subsumed them, arriving at a multiplier of 1.5. Indeed, the Special Master specifically found that plaintiffs counsel were not entitled to "additional remuneration for the time spent in this application for fees, nor for their time spent defending the settlement if an appeal is prosecuted." [5] *See* Report at 33. This finding is not clearly erroneous, and the Court declines to reject it.

---

**4.** Plaintiffs counsel's contentions in this regard are characterized by objectant Paul Hessemer as follows: "They remind me of a child who sees a parent with a few lolly pops to be distributed and isn't satisfied when he does not receive them all." *See* Doc. No. 81. Other than his "dismay" that plaintiffs counsel "is still torturing our intellect over this entire matter," Mr. Hessemer ap-

parently supports the Special Master's recommendation of a reduced fee of $1 million.

**5.** It is not clear whether plaintiffs counsel request additional compensation for preparing and filing their objection to the Special Master's Report. To the extent that such a request is being advanced it is denied.

## Conclusion

For the reasons set forth above, the objections to the Report are disapproved and dismissed, and the entire Special Master's Report annexed hereto and made a part hereof is now incorporated and adopted as part of decision and order of this Court.

It is now appropriate to submit a final judgment in these consolidates actions, on ten (10) days notice of settlement or waiver of such notice.

SO ORDERED.

## SPECIAL MASTER'S REPORT

By order dated April 23rd, 1998, United States District Judge Charles L. Brieant appointed the undersigned as Special Master, pursuant to FRCP Rule 53, to hear the application of plaintiffs' counsel for legal fees for services rendered in the prosecution of this action and to report upon:

> a reasonable fee to be awarded under the totality of the circumstances found to be present in the case.

The several counsel for Plaintiffs seek a combined award of $1,400,000. This sum represents a combined straight hourly charge of $633,355.50, plus expenses incurred by all counsel for plaintiffs of $34,381.05. Plaintiffs counsel thus seek a 2.15 "lodestar" multiplier (i.e., the cumulative straight hourly fees as multiplied), plus expenses. This report recommends that fees sought be reduced and the aggregate fee awarded should be $1 million, including expenses, or a lodestar of approximately 1.5.

## BACKGROUND[1]

The genesis of this derivative class action against former and current directors of Texaco, Inc. ("Texaco") is directly traceable to the class action complaint for employment discrimination filed against Texaco in March 1994 (and later amended) captioned *Roberts v. Texaco, Inc.*, 979 F.Supp. 185, (hereinafter the *"Roberts* Action" or *"Roberts* "). That complaint alleged that Texaco had engaged in conduct that had a disparate impact upon and abridged the rights of salaried African–American employees of the company in promotions, compensation and the terms and conditions of their employment, including training and job assignments. Plaintiffs here, four Texaco shareholders, have alleged in the wake of the *Roberts* Action that present and past Texaco directors breached their fiduciary duties to the company and its shareholders, and wasted corporate assets, by intentionally, recklessly, grossly negligently and/or negligently failing to exercise appropriate oversight in connection with Texaco's compliance with federal and state civil rights laws, enforcement of anti-discriminatory practices, conduct within Texaco's human resources department, and particularly in the defense of the *Roberts* Action. Additionally, plaintiffs alleged that three former Texaco employees also intentionally, recklessly and/or negligently breached their fiduciary duties to the company and its shareholders.

As detailed in Judge Brieant's decision in *Roberts* —which adopts the undersigned's Special Master's report dated July 22, 1997— the *Roberts* Action gained nationwide prominence following public disclosure of an audio tape of conversations of Texaco employees made surreptitiously by a disgruntled fellow employee, defendant Lundwall. The conversations recorded there provided evidence, indicating an attitude of racial bias on the part of certain management-level personnel at Texaco towards the plaintiff class in *Roberts,* and suggesting possible obstruction of justice in connection with the pre-trial discovery in the litigation. *See* 979 F.Supp. at 190.[2]

As a direct result of the disclosure of the audio tape, Texaco and the *Roberts* plaintiffs entered into an "agreement in principle" to settle their civil rights claims on Novem-

---

1. Judge Brieant's decision in *Roberts v. Texaco, Inc.*, 979 F.Supp. 185 (S.D.N.Y., 1997) sets forth in considerable detail the pertinent background. To avoid repetition, this Report assumes familiarity with that decision and limits discussion to only the most salient facts.

2. Two former Texaco employees, defendants Richard A. Lundwall and Robert W. Ulrich, were tried before a jury in the Southern District of New York and acquitted on June 8, 1998 on federal charges of obstruction of justice. Such acquittal occurred some time after the execution of the Stipulation of Settlement herein. *U.S. v. Lundwall,* 97 Cr. 0211(BDP).

ber 15, 1996.[3] This settlement was developed in greater detail in the stipulation of settlement agreement dated January 21, 1997.

Pursuant to this settlement, a common fund of $115 million was created to pay the monetary claims of all individual class members in the *Roberts* Action, in addition to the costs of suit, including attorney's fees and the costs of administering the plan of allocation (a court-approved plan to assess claims and distribute the settlement fund, *id.* at 192.). The settlement also required an 11.34% pay increase for all class members employed by Texaco on November 15, 1996. The total cost of the settlement was valued at over $172 million. *Id.*

Additionally, the settlement required that Texaco and the plaintiffs maintain an independent "Task Force on Equality and Fairness in Employment" (the "Task Force") over a period of five years to determine revisions and additions to Texaco's human resource programs and to oversee implementation of the programmatic changes required by the settlement.[4] The seven-person Task Force, composed of three designees each by Texaco and the plaintiffs and one independent to be appointed jointly, is to provide a report to the Court. Texaco's Chairman, and its Board of Directors every six months for a term of 5 years, setting forth information relevant to the impact of the settlement, plus a detailed annual report concerning the impact of its actions in the realm of equal opportunity enhancement. The Task Force was also charged with helping to monitor the progress made toward creating opportunity for African–Americans, diversity in the Texaco workforce and equal opportunity for all Texaco employees. *Id.*

On November 6, 1996, two years after the commencement of the *Roberts* Action and a little less than two weeks before the settlement in principle of *Roberts,* plaintiff Nathan Kaplan filed a Verified Derivative Complaint against past and present Texaco directors as described above. Separately, on November 13, 1996, plaintiffs Edith Citron and Martin H. Philips filed a substantively similar Verified Derivative Complaint against past and present Texaco directors. Pursuant to a pretrial conference before Judge Brieant, on January 19, 1997, the Kaplan and Citron actions were consolidated, and a consolidated amended complaint was filed on January 27, 1997 ("Amended Complaint"). After consolidation, the following present and past directors of Texaco were named as defendants in the amended complaint: Robert A. Beck, Peter I. Bijur, John Brademas, Willard C. Butcher, Edmond M. Carpenter, Alfred C. DeCrane, Jr., Michael C. Hawley, Franklyn G. Jenifer, Allen J. Krowe, Thomas S. Murphy, Charles H. Price, II, Robin B. Smith, William C. Steere, Jr., Thomas A. Vanderslice and William Wrigley. The following former employees of Texaco were also were named as defendants: Robert Ulrich (formerly Texaco's Treasurer), J. David Keough (formerly Senior Assistant Treasurer), and Richard A. Lundwall (formerly Senior Coordinator for Personnel Services).

Nearly contemporaneous with the filing of the complaints mentioned above, counsel for Martin Frisch and Jonathan Gross provided Texaco's counsel with a draft complaint (the "Frisch Complaint"). The Frisch complaint asserted (1) essentially the same claims against the same defendants as the Amended Complaint, and (2) additional claims under Section 14(a) of the Securities Exchange Act of 1934 and Rule 14a–9 thereunder. The Section 14(a) claims alleged that Texaco's Proxy Statements for 1994, 1995 and 1996 contained false and misleading statements concerning Texaco's compliance with Federal and State Civil Rights laws. The Frisch

---

**3.** In the interests of completeness, it should be noted that, following disclosure of the above-noted taped audio recordings, Texaco retained distinguished counsel Michael Armstrong to investigate and the tapes were then caused to be re-mastered. The resulting enhanced tapes apparently did not reflect the scurrilous statements evidencing racial bias that had originally appeared. *See Roberts,* 979 F.Supp. at 190.

**4.** These changes included, but are not limited to: adopting and implementing company-wide diversity training programs and mentoring programs, implementing an ombudsperson program, implementing national job posting through at least pay grade 18 and developing recommendations for the implementation of procedures to minimize fear of retaliation in connection with complaints of employment discrimination. *Id.*

Complaint was not filed. Instead, pursuant to an agreement between counsel for Frisch and Texaco, the statute of limitations on the claims were tolled.

On February 10, 1997, the Texaco defendants moved to dismiss the Amended Complaint on the grounds of: (1) subject matter jurisdiction, namely a lack of diversity; (2) failure to state a claim pursuant to Federal Rule 12(b)(6) in that plaintiffs' claims against Texaco's Directors were barred by Texaco's Certificate of Incorporation; and (3) lack of standing, pursuant to FRCP 12(b)(6) and 23.1, to maintain a derivative suit on behalf of Texaco because plaintiffs failed to make a pre-litigation demand upon Texaco's Board of Directors or plead particularized facts demonstrating that demand is excused as futile.[5] Following briefing on the motions to dismiss, the issue of subject matter jurisdiction was resolved by an agreement that Mr. Beck, who had then recently passed away, and his estate would no longer remain in the case as a defendant. Diversity of citizenship was thus obtained and defendants withdrew their motion to dismiss for lack of subject matter jurisdiction.

On May 23, 1997, Judge Brieant heard oral argument on defendants' motions to dismiss these shareholder proceedings. Parenthetically, Judge Brieant had earlier approved settlement of the *Roberts* Action, and Judgment, disposing of *Roberts* in accordance with the above-summarized settlement, had been filed on March 21, 1997.

Following oral argument of the dismissal motions in this case, counsel for the parties, at the Court's suggestion, commenced extensive negotiations concerning settlement. The negotiations resulted in an agreement in principle on September 26, 1997 and, later, a Stipulation of Settlement, dated December 29, 1997. On September 29, 1997, after learning that an agreement in principle had been reached to settle the litigation, the Court denied the pending motions to dismiss "without prejudice, with leave to renew on the same or additional papers in the event [the] proposed settlement of the litigation fails of consummation." September 29, 1997 Order.

The terms of the Stipulation of Settlement between the shareholder plaintiffs and the Texaco defendants provide:

(1) A statement will be included in Texaco's Annual Report for the year 1997 stating that shareholders may receive a copy of the public portion of the Equality and Fairness Task Force's Annual Report to the Court, prepared pursuant to the Settlement of the *Roberts* Action, by writing to, sending an e-mail to, or calling a toll-free number at, Texaco and requesting a copy. This obligation will continue for so long as the Task Force remains in existence. Any portion of the Task Force's Report that is not made public by the Task Force or that is sealed by the Court need not be provided to shareholders.

(2) The following "Statement of Equality and Tolerance Objectives" will be made a part of all new contracts entered into by Texaco with outside vendors:

"Texaco Inc. is affirmatively committed to the fullest extent to an environment of inclusion; to eradicate all forms of prejudice within the company; to promote and foster complete equality of job opportunities within the company to all applicants and employees regardless of race, gender, religion, age, national origin and disability; and to insure tolerance, respect and dignity for all people."

Texaco will take reasonable steps to enforce the principles set forth in this Statement. The affirmative commitment in this Paragraph shall not apply to existing contracts, and shall not apply in any jurisdiction if and to the extent that it is or becomes inconsistent with any law of that jurisdiction. Any failure by Texaco to act in accordance with this obligation will not give rise to any cause of action or third party beneficiary right in favor of any person or entity other than Texaco.

Pursuant to the settlement, all the claims alleged or that could have been alleged by the plaintiffs in the litigation were released

5. Motions to dismiss were also filed by Defendants Keough, Lundwall and Ulrich.

and the action dismissed.[6] The parties also agreed that if the Court approved the settlement, then counsel for plaintiffs may seek attorneys' fees and expenses in an amount to be determined by the Court, but not to exceed 1.4 million dollars. Defendants agreed not to oppose the fee application. The settlement agreement also provided that any attorney's fees awarded by the Court would be paid by Texaco's Directors' and Officers' liability insurer. Stipulation of Settlement, dated December 29, 1997.[7]

Notice of the proposed settlement was mailed to the holders of record of Texaco common stock, approximately 550,000 Texaco shareholders.[8] The Notice specified the terms of the settlement, the date of the scheduled settlement hearing, that plaintiffs' counsel would be applying for attorneys' fees and expenses and the amount of such applications, and that Texaco shareholders had the right, until March 17, 1998, to file written objections and to appear at the judicial hearing on the adequacy of the settlement and the reasonableness of the attorneys' fees and expenses being sought.[9] In all, some twenty written submissions, including anonymous ones, were received by counsel for Texaco or the Court commenting upon or objecting to the proposed settlement and/or requested fee.

Judge Brieant conducted a hearing on March 31, 1998 where objectors, plaintiffs' counsel and defendants' counsel were given an opportunity to be heard regarding the reasonableness of the proposed settlement. Three objectants appeared at the March 31, 1998 hearing and voiced their opposition to the settlement and the request for attorneys' fees.[10] In a Memorandum and Order dated April 15, 1998. Judge Brieant concluded that the proposed settlement was fair and reasonable and the result of arm's length negotiation in good faith and therefore should be approved.

The Court adverted to the difficulties presented to the plaintiffs' prosecution of this action in light of Texaco's certificate of incorporation pursuant to Section 102(b)(7) of the Delaware Corporation Law, which severely limits the personal liability of its directors, as well as to the issue presented by a lack of shareholder demand in the case. In addition, the Court noted that the litigation value of the claim is:

[L]imited by the effect of the so-called Business Judgment Rule, which applies only to the conduct of the Directors following discovery of the clandestine audio tapes. The Directors have never made a formal decision that they would not pursue all identified wrongdoers. Any such effort would have to await the conclusion of the pending criminal prosecutions. However, a rational director could well conclude that the absence of substantial assets on the part of the actual malefactors renders the claim against them not worth pursuing in behalf of the corporation, as a matter of business judgment. Also as noted earlier, the required showing of reckless indifference to support individual director liability for failure to catch the problem in time to avoid the substantial damage visited on the corporation [by the *Roberts* Action] presents a high threshold, which on the present record very likely could not have been met.

April 15, 1998 Memorandum and Order at 9.

Upon the totality of the record, the Court concluded that the "non-pecuniary so-called

---

6. Texaco and its corporate subsidiaries and parents, present or past directors, officers, employees or attorneys did not, however, release any claims against the three individual non-officer defendants Keough, Lundwall and Ulrich. Similarly, Messrs. Keough, Lundwall and Ulrich did not release any claims against Texaco or any director or subsidiary or parent of Texaco.

7. The Notice and Stipulation of Settlement are on file with the District Court.

8. The notice, dated January 26, 1998, was mailed by Texaco two days later. Texaco's affidavit of service is on file with the District Court.

9. A Joint Petition of Plaintiffs' Counsel for Award of Attorneys' Fees, Affidavit of Plaintiffs' Counsel in Support of Proposed Settlement and Award of Attorneys' Fees, and Defendant's Memorandum of Law in Support of Proposed Settlement were filed with the Court.

10. These three were Joseph McLaughlin, William C. Rand and Glendora. Each of those objectants appeared at the conference-hearing convened by the Special Master and reiterated or expanded upon their objections to the joint counsel fee application.

therapeutic benefits to the Corporation are in the totality of the circumstances of this case sufficient consideration for the settlement of the derivative claims brought on behalf of the Corporation, and that approval of this arm's length settlement, is in the interests of the shareholder and the Corporation." *Id.* Importantly, in confirming the settlement, the Court found plaintiffs to be prevailing parties and to "have conferred a benefit on the corporation, so as to be entitled to recover their legal fees and disbursements." *Id.* However, the Court reserved decision on the amount of the reasonable fees and disbursements to be awarded to plaintiffs' counsel.

By order dated April 23, 1998, the Court appointed the undersigned to hear and report as to a reasonable fee to be awarded under the totality of the circumstances found to be present in this case.[11]

Notice of a May 14, 1998 hearing before the Special Master was sent by U.S. Mail to all counsel and objectors under date of April 29, 1998.[12] The April 29, 1998 Notice invited written submissions and also extended an opportunity for the parties—objectors, plaintiffs' counsel and Texaco's counsel—to be heard on the application for legal fees.

The additional written submissions received by the Special Master in response included the following: a letter from objectant James M. Niefer, a letter from objectant Joseph McLaughlin, Esq., an affirmation from objectant Mark Skeen, a memorandum of law by objectant William Rand, Esq., a letter from objectant Paul Hessemer, a letter from objectant Benedict M. Kohl, and writings from objectant Glendora, as well as plaintiffs' counsel's detailed time records (filed under seal pending order of the Court).

The hearing was transcribed, and it is submitted to the Court herewith, together with the exhibits then marked. Appearances were made by attorneys from each of the five law firms representing plaintiffs and three objectors, Joseph McLaughlin, William C. Rand and Glendora, each of whom were given an opportunity to be heard on the request for attorneys' fees. In response to points raised at the hearing, additional written submissions were received by the Special Master. First, Dennis J. Block, of Weil, Gotshal & Manges LLP. attorneys for Texaco, in a letter dated May 19, 1998, opined that the provision in the Settlement requiring the incorporation of the Statement of Equality and Tolerance Objectives into any new contracts entered into by Texaco with new vendors could give rise to a derivative action should Texaco fail to live up to its affirmative obligations under the Settlement Agreement.[13] Second, plaintiffs' counsel submitted a Supplemental Joint Petition, dated May 21, 1998, in support of their application for attorneys' fees and expenses, and a further Letter Supplement, dated June 15, 1998. Third, objectant Glendora made additional submissions, dated May 30, 1998 and June 19, 1998.

## APPLICATION FOR COUNSEL FEES

Five law firms representing plaintiffs have submitted a joint petition for an award of attorney's fees in the amount of $1.4 million dollars including expenses. The firms are Milberg Weiss Bershad Hynes & Lerach LLP ("Milberg Weiss"); Weiss & Yourman ("Yourman"); Law Offices of Curtis V. Trinko LLP ("Trinko"); Stull, Stull & Brody ("Stull") and the Law Offices of Harvey Greenfield ("Greenfield").

---

**11.** The Special Master's oath then was executed and submitted for filing.

**12.** The objectors to whom this letter was sent were those shareholders who had previously objected in writing to the proposed settlement. The individual objectants are: Lewis A. Barber, Jr., M.D. Dalbey, Gus C. Daskalakis, James M. Furey, Sr., Glendora, Linda K. Hall, John Kandilakis, Will Kernen, Elizabeth McLaughlin, James M. Niefer, William C. Rand, Benjamin D. Scheibe, Terry S. Shilling, Mark L. Skeen, Paul Heessemer, Benedict M. Kohl, E. Schwarz, and Edward Morrison.

**13.** Mr. Block, in his May 19, 1998 letter, also responded to the Special Master's inquiry at the Hearing as to whether Texaco's insurance carrier had entered into any agreement with the company as to whether it would seek to recoup from Texaco its proposed legal fees payment from subsequent premiums or the like. Mr. Block, declined to speculate as to the carriers intent, but stated that "... Texaco [had] recently renewed its D & O policy in a relatively soft market in exchange for the same premium it previously had been paying."

According to the joint petition, counsel fees reflect a combined straight hourly charge of $633,355.50. This represents the arithmetic calculation of the number of hours each attorney spent on the matter multiplied by that attorney's current hourly rate.[14] The expenses incurred by all plaintiffs' counsel in the prosecution of the action aggregated $34,381.05. Plaintiffs' counsel have requested a 2.15 multiplier of the cumulative straight hourly fees incurred by counsel in this action, which, together with their expenses, approximates $1.4 million.

In support of their application, counsel have submitted the aforesaid joint memoranda of law and the supporting affidavit of Sanford P. Dumain, a partner at Milberg Weiss, which includes affidavits from each of the other four plaintiffs' law firms outlining the total number of hours worked by individual attorneys or paralegals and relevant expenses. Milberg Weiss' time lists 763.50 hours of partner, associate and paralegal time equaling $218,781.25 ($27,885.11 of expenses); Yourman's time lists 468 hours of partner, associate and paralegal time equaling $169,720.00 ($500 in expenses); Stull's time lists 336 hours of partner, associate and paralegal time equaling $142,610 ($1,783.66 in expenses); Trinko's time lists 226.90 hours of partner, associate and paralegal time equaling $77,325.50 ($2,499.62 in expenses); Greenfield's time lists 47.25 hours of partner, associate and paralegal time equaling $24,918.75 ($1,712.65 in expenses).[15]

### Summary of Arguments

In support of the reasonableness of their fee application, plaintiffs' counsel argue that the Texaco defendants are represented by highly-skilled lawyers, and do not need (or seek) protection from the Court for the results of their own pre-settlement negotia-tions (which produced written agreement by counsel for Texaco, Dennis Block, Esq., not to oppose this fee application). They claim their fee request is an arm's length negotiated and "market-set" reasonable fee. Moreover, they contend that the fees are reasonable because counsel for plaintiffs have exacted a substantial benefit for Texaco.[16]

The substantial benefit they posit is that shareholders will now have greater involvement in Texaco's policies and efforts regarding equal employment because of the increased access to the Task Force Report, thus greatly enhancing their ability to monitor the company's efforts in this regard. Counsel claims that the terms of the proposed settlement shall further compel Texaco, in all of its business affairs (and not just with regard to the *Roberts* settlement's employment issues), to comply with its obligations under the federal and state civil rights laws, and, perhaps, beyond the precise strictures of such mandates. Texaco assumes the obligation to make clear to its vendors that it

> ... is affirmatively committed to the fullest extent to an environment of inclusion: to eradicate all forms of prejudice within the company; to promote and foster complete equality of job opportunities within the company and all applicants and employees regardless of race, gender, religion, age, national origin and disability; and to insure tolerance, respect and dignity for all people.

Stipulation of Settlement.

Plaintiffs' counsel maintain, and counsel for Texaco has effectively acknowledged as outlined above, that, should Texaco knowingly fail or refuse to live up to the commitment (*e.g.*, by declining to act to secure appropri-

---

**14.** At the above-noted Hearing, the Special Master requested that plaintiffs' counsel separately submit a certification that the time charges upon which they predicated their claims were their regular hourly charges for non-contingent clients. Such submissions have been made.

**15.** Detailed time records have been submitted by each counsel summarizing the services performed on each occasion, by whom, the time involved and identifying the hourly rates of the pertinent individuals.

**16.** Additionally, counsel argue that the relatively small number of objectors, roughly 20 out of 550,000 weighs heavily in favor of approving the fee request, but this fact seems of no moment, as a myriad of factors influence whether an individual shareholder seeks to object, the majority of which do not relate to the merits of the fee application. *See, e.g., In the Matter of Continental Illinois Securities Litigation,* 962 F.2d 566, 573 (7th Cir.1992).

ate vendor compliance with this undertaking), Texaco's shareholders could seek appropriate redress.[17] Counsel argues that this undertaking confers a meaningful benefit upon the corporation and its shareholders.

Additionally, plaintiffs' counsel highlight that from the inception of the action, there existed the very significant possibility that plaintiffs' counsel would obtain no recovery, and hence no compensation. According to both plaintiffs' counsel's submissions and defendants' counsel's memorandum of law in support of the settlement, plaintiffs' counsel faced serious difficulties in overcoming the Business Judgment Rule and the demand requirement and proving, to the satisfaction of a fact-finder, both the liability of defendants and the causal nexus between the damages suffered by the corporation and the defendants' conduct. Thus, plaintiffs' counsel argues, they are entitled to an upward enhancement of their straight hourly fee in light of this litigation risk, the contingent nature of their fees, the quality of their opposition, and the "substantial benefit" they achieved. Parenthetically, the notion that lawyers are entitled to an upward enhancement of fees because they undertook a potentially flawed claim seems strained, to say the least. The notion that a meritorious claim taken on contingency and subject to litigation risk is entitled to an upwards enhancement, however, has received judicial sanction, albeit when coupled with language to the effect that a meaningful benefit was, nonetheless obtained. *See Dubin v. E.F. Hutton Group, Inc.*, 845 F.Supp. 1004, 1014 (S.D.N.Y.1994) *Kronfeld v. Transworld Airlines, Inc.*, 129 F.R.D. 598, 609–10 (S.D.N.Y.1990).

The objectors, by contrast, although they vary widely in tone and substance, focus their arguments primarily on the total fees requested, which they claim are "excessive"

in light of the settlement's lack of monetary benefit to the corporation. Further, they argue, given the substantial benefits achieved by the *Roberts* Action, the terms of this settlement provide no more than a minimal additional benefit. First, they contend the shareholders are being provided access to a document (the Task Force Report) that is already a public document available from the Court. Second, the corporation, in their view, was sufficiently sensitized to equal opportunity issues through the *Roberts* Action, and therefore the relief secured upon settlement of the derivative action was duplicative and ephemeral.

Certain objectants also question the amount of hours billed. These objectants point to the fact that there was limited discovery up to the point of settlement with no depositions taken and motion practice limited to the motions to dismiss. Lastly, the objectants, almost uniformly, take issue with the disclosure that any attorneys' fees awarded by the Court would be paid by Texaco's directors' and officers' liability insurer. According to them, this fact is irrelevant because they claim Texaco will pay in the end for these fees in the form of increased insurance premiums in the future.

Defendants, in conformity with the settlement agreement, have not opposed the application for attorneys' fees and take no position as to the propriety of class counsel's requested award of attorneys' fees and expenses. As noted, counsel herein for Texaco, Dennis Block, Esq., has made a written post-Hearing submission. Among other things (*see supra*), Mr. Block has there represented, in response to the insurance premium argument noted above, that the Directors and Officers insurance policy has, in fact, now been renewed without any premium increase.[18]

---

17. In response to the question raised at the hearing whether Texaco's directors and officers could be subject "to a shareholders derivative suit ... should [Texaco] fail to live up to its obligation to take reasonable steps to enforce those principles incorporated in the Settlement Agreement," Transcript at 49, 52–53, Mr. Block wrote: "The answer, I believe, is yes. This answer, I emphasize, in no way waives any rights or defenses that Texaco's directors and officers would have in any such suit."

18. Mr. Block disclosed that he had no information whether the insurance carrier will in the future seek to recoup its payment of attorneys' fees under the settlement in whole or in part in subsequent premiums or the like. *See* fn. 13. *supra.* The Special Master can discern no reason why Texaco would permit itself to be charged such additional premiums, since it can presumably purchase the insurance elsewhere.

## DISCUSSION

The question here presented—the reasonableness of plaintiffs' counsel fee application—turns on the value of the benefit conferred in the context of the totality of the circumstances. The Court in approving the settlement has already concluded that a sufficient benefit to warrant settlement has been conferred. This report measures the quantum of that benefit and its worth in terms of counsel fees.

Preliminary, it must be noted that the courts have consistently held that they are obliged to carefully scrutinize applications for counsel fees in cases such as this. Hence, little weight need be given to the fact that counsel for the stockholder (or class action) plaintiffs have concluded a fee agreement, howsoever couched, with competent defense counsel (*e.g.*, that defendants' counsel will not object to a fee application provided it falls within a specified range). *See Blum v. Stenson*, 465 U.S. 886, n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) (duty of court to determine whether the requested attorneys' fees and expenses are reasonable); *In re McDonnell Douglas Equipment Leasing Sec. Litig.*, 842 F.Supp. 733, 740 (S.D.N.Y.1994) (district court not bound by agreement of parties as to amount of attorneys' fees in settlement of class action) (citing *Piambino v. Bailey*, 610 F.2d 1306, 1328 (5th Cir.1980), *cert. denied*, 449 U.S. 1011, 101 S.Ct. 568, 66 L.Ed.2d 469 (1980)). The court's obligation to protect the interests of shareholders (or the class) is not diminished by such agreements. *See City of Detroit v. Grinnell Corp.*, 560 F.2d 1093, 1099 (2d Cir.1977) ("Grinnell II") (court stands as a fiduciary to the absent class members on fee petition); *Trief v. Dun & Bradstreet Corp.*, 840 F.Supp. 277, 282 (S.D.N.Y.1993) (court as guardian of rights of class members not bound by the amount of the fee award requested).

The general rule in the American legal system, as opposed to the practice in England and elsewhere in Europe, is that attorney's fees for litigation are not ordinarily recoverable as costs.[19] Significant exceptions to this principle, however, have been developed by the courts and Congress when overriding equitable, social or economic considerations militate in favor of such a recovery. Thus, a substantial number of federal statutes either authorize or require courts to award attorneys' fees to counsel for prevailing plaintiffs.[20] And, for more than one hundred years, the courts have exercised their equitable power to award fees and expenses when a suit has been successfully maintained on behalf of a class and established a common fund for their benefit.[21] This common or equitable fund doctrine "allows an attorney whose actions have conferred a[n economic] benefit upon a given group or class of litigants [to] file a claim for reasonable compensation for his efforts." *Grinnell II*, 560 F.2d 1093, 1098. Significantly, the instant case, is not one where a "common fund" has been recovered.[22]

■ However, an offshoot of the common fund doctrine is the "substantial benefit" theory which allows counsel fees to successful prosecutors of derivative suits, although no judgment has been obtained creating a common fund, provided it can be shown that a substantial benefit to the corporation was gained through counsel's efforts. *See Schechtman v. Wolfson*, 244 F.2d 537, 540 (2d Cir.1957); *United Operating Company v. Karnes et al.*, 482 F.Supp. 1029, 1031–32 (S.D.N.Y.1980), *See also Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 391–92, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970) (although nonmonetary, the enforcement of proxy rights does not preclude award of fees); *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203,

**19.** Berger, Court Awarded Attorneys' Fees: What is "Reasonable"? 126 Univ. of Pa.L.Rev. 281 (1977).

**20.** Recent calculations have put the number of fee-shifting federal statutes at no less than 200. *See* Charles Silver, Unloading the Lodestar: Toward a New Fee Award Procedure, 70 Tex.L.Rev. 865, 866, n 1 (1992).

**21.** *See, e.g., Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885).

**22.** Because this is not a "common fund" case, the authorities cited by plaintiffs' counsel and objectants concerning the appropriate "common fund" lodestar multipliers are less instructive than the parties have suggested.

1207 (6th Cir.1992) (changes in corporate governance aimed at limiting corporation's disbursements to settling defendant director and controlling shareholder); *Maher v. Zapata Corp.*, 714 F.2d 436, 466 (5th Cir.1983) (non-monetary recovery is adequate to justify fees).

The difficulty in valuing this type of therapeutic relief, however, has been noted as posing significant risks. As the Third Circuit commented in *Bell Atlantic Corp. v. Bolger et al.*, 2 F.3d 1304, 1311–12 (3d Cir. 1993), "[p]arties may capitalize on the valuation problem and exchange cosmetic 'reforms' for plaintiffs' fees...." *See also Schechtman*, 244 F.2d at 540 (there should be some check on derivative actions lest they be purely strike suits of great nuisance and no affirmative good, hence the requirement of substantial benefit).

■ Mindful of these concerns, and the Court's fiduciary role in reviewing the attorneys' fees petition, we begin at the beginning, which is to say, the "lodestar." The Second Circuit has made it abundantly clear that the starting point for the determination of a reasonable fee is the calculation of the "lodestar" amount. *See Quaratino v. Tiffany & Co.*, 129 F.3d 702, 704 (2d Cir.1997) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)) *rehearing en banc held and sub judice.* The "lodestar," in turn, is "properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Blanchard v. Bergeron*, 489 U.S. 87, 94, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989).

■ In determining the number of hours reasonably expended for purposes of calculating the lodestar, the district court should exclude excessive, redundant or otherwise unnecessary hours, as well as hours dedicated to severable unsuccessful claims. *See Hensley*, 461 U.S. at 433–35, 440, 103 S.Ct. 1933. The lodestar may be adjusted upward or downward based on several factors, most importantly for the "results obtained." *Id.* at 434, 103 S.Ct. 1933. There is, however, a "strong presumption" that the lodestar figure represents a reasonable fee. *See Pennsylvania v. Delaware Valley Citi-*

*zens' Council for Clean Air*, 478 U.S. 546, 565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986); *Orchano v. Advanced Recovery, Inc.*, 107 F.3d 94, 99 (2d Cir.1997).

■ The Court of Appeals in *City of Detroit v. Grinnell*, 495 F.2d 448, 470 (2d Cir. 1974) ("Grinnell I") provided a list of factors for consideration in evaluating fee applications which comprise: (1) the time and labor expended by counsel, (2) the magnitude and complexity of the litigation, (3) the risk of litigation, (4) the quality of the representation, (5) the size of the requested fee in relation to the settlement, and (6) public policy considerations.

Accordingly, turning attention first to the number of hours expended in the prosecution of this action, the Milberg Weiss' time sheets list and describe 763.50 hours of partner, associate and paralegal time: Yourman's time sheets list and describe 468 hours of partner, associate and paralegal time; Stull's time sheets list and describe 336 hours of partner, associate and paralegal time; Trinko's time summaries or sheets list and describe 226.90 hours of partner, associate and paralegal time; and Greenfield's time summaries list 47.25 hours of partner, associate and paralegal time.

■ In arriving at their lodestar, plaintiffs' counsel used current hourly rates as of 1998, rather than historic billing rates. As Judge Brieant noted in *Union Carbide Corporation Consumer Products Business Securities Litigation*, 724 F.Supp. 160 (S.D.N.Y. 1989), "courts in this district have approved the use of current billing rates in calculating the lodestar amount, in order to compensate for the delay in receiving compensation, inflationary losses, and the loss of interest." *Id.* at 163–64 (citations omitted). The Second Circuit has impliedly approved such practice, "if the services were rendered over two or three years, relevant figures for the current year will normally still be appropriate." *New York State Ass'n for Retarded Children, Inc., v. Carey*, 711 F.2d 1136 (2d Cir.1983). *See also Missouri v. Jenkins*, 491 U.S. 274, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989). Further, the standard, as articulated by the Second Circuit, is that the compensable rate is

that "normally charged for similar work by attorneys of like skill in the area." *Grinnell II*, 560 F.2d at 1098.[23]

After examining the time records submitted, it is, my view that the amount of time claimed for each firm and their respective attorneys and paralegals is reasonable considering the issues and challenges presented and the vigor with which skilled and highly experienced plaintiffs' counsel proceeded and equally skilled and experienced defense counsel pressed an aggressive defense strategy.[24]

■ Once the "straight" lodestar is calculated, one must consider whether an enhancement or decrease is warranted. *See Grinnell I*, 495 F.2d at 471. A multiplier may be applied to the lodestar in equitable fund cases based on certain "less objective factors" such as contingent risk,[25] superior quality of representation, and results achieved. *See In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 226, 232 (2d Cir.1987); *Grinnell I*, 495 F.2d at 471; *Grinnell II*, 560 F.2d at 1098. While a multiplier has often been applied to a lodestar calculation within this Circuit, its use consistently has been subject to stringent requirements, especially in circumstances where, as here, no common fund has been created and the non-monetary relief won is not readily capable of valuation. *See Maywalt v. Parker Parsley Petroleum Co.*, 864 F.Supp. 1422, 1437 (S.D.N.Y.1994), *aff'd.*, 67 F.3d 1072 (2d Cir.1995).

Here, the request is for a multiplier of 2.15.

Plaintiffs' counsel argue in favor of the upwards enhancement on the basis of the *Grinnell I* upwards enhancement factors—litigation risk: the contingent nature of the

fee; the quality of opposition; and the substantial benefit achieved. Objectants, as noted, focus their attack on the lack of monetary benefit to the corporation. On this basis, the objectors argue the lodestar should be reduced, or disallowed altogether, for lack of success. *See e.g. Carroll v. Blinken*, 105 F.3d 79, 81 (2d Cir.1997) (lowered award is reasonable when relief more than nominal, but practical effect of relief is entirely minimal). *See also Rosen v. Smith*, 11 Del.J. Corp. L. 989, 1985 WL 21143 (Del.Ch. 1985) (unreported decision) (fees subject to reduction by 1/3 where relief is "nebulous").

■ As stated, Objectants' primary argument is that, because there is no monetary relief to the shareholders or the corporation, the settlement creates no benefit, and, in turn, counsel fees should not be awarded. This reductionist view is not the law. Indeed, it is well established, that non-monetary benefits, such as promoting fair and informed corporate suffrage [*Mills v. Electric Auto–Lite Co., supra* ], or deterring future misconduct by management [*Kopet v. Esquire Realty Co.*, 523 F.2d 1005 (2d Cir. 1975) ], may support a fee award.[26] In any event, the issue is academic. Judge Brieant has already determined that the settlement provided a benefit to the shareholders and the corporation which justified an award of reasonable attorneys' fees and expenses (*see* April 15, 1998 Mem. & Order at 8–9). Further, as shown below, that determination is amply supported by this record. Hence, objectants' arguments in favor of disallowing fees altogether is without merit.

The question still remains, however, what enhancement or decrease in fees is appropri-

---

**23.** While some of the hourly rates relied upon are in the area of $500, the undersigned notes, from experience, that, though substantial, such rates are not at substantial variance from those charged by senior qualified counsel in the Southern District of New York. Additionally, plaintiffs' counsel have certified that the hourly rates, on which their respective computations were predicated, correspond to those regularly charged by them in non-contingent matters.

**24.** It could be argued that staffing by certain counsel, in terms of partner hours versus associate hours, or the like, was not economically efficient or that issues might have been less thoroughly explored. However, such hindsight ig-

nores the realities of litigation and the exigencies faced by the particular counsel at any given stage of the proceedings. It seems to the undersigned that, unless excesses or mismanagement are apparent to an experienced eye, such "Monday morning quarterbacking" is inappropriate. *See In the Matter of Continental Illinois Securities Litigation*, 962 F.2d 566, 570 (7th Cir.1992).

**25.** *See* p. 15 *supra*.

**26.** *See also, Karnes et al., supra*, 482 F.Supp. at 1031–32; *Maher v. Zapata Corp., supra*, 714 F.2d 436.

ate in light of the settlement achieved. While Judge Brieant found "sufficient" benefit, he did not qualify it or characterize it further.

A number of courts have confronted the problem of evaluating the value of non-monetary relief in the context of settlement and a request for attorneys' fees. *Schechtman v. Wolfson, supra,* 244 F.2d 537, *Bailey v. Meister Brau, Inc.,* 535 F.2d 982 (7th Cir. 1976); *Lewis v. Anderson,* 509 F.Supp. 232 (C.D.Cal.1981); *United Operating Co. v. Karnes,* 482 F.Supp. 1029 (S.D.N.Y.1980). Few decisions, however, have produced a guide to this slippery process, particularly in the context here presented—one where no common fund was created and the benefit cannot be thus measured, in whole or in part, in monetary terms.

As one court attempting this difficult assessment put it, "the benefit must be something more than technical in its consequence and be one that accomplishes a result which corrects or prevents an abuse which would be prejudicial to the rights and interests of the corporation or affect the enjoyment or protection of an essential right to the stockholder's interest." *Bosch v. Meeker Cooperative Light & Power Assoc.,* 257 Minn. 362, 367, 101 N.W.2d 423, 426–27 (1960). In *Mokhiber v. Cohn,* 608 F.Supp. 616, 627 (S.D.N.Y. 1985), Judge Knapp, in an attempt to quantify a non-monetary settlement, helpfully catalogued cases in this Circuit and elsewhere where stockholders' attorneys produced non-monetary benefits and received an award of fees.[27] Again, no fee measurement standard is, however, discernible.

Indeed, plaintiffs' counsel have failed to present a single decision from this Circuit, nor has research uncovered any, where a purely non-monetary benefit was gained by counsel in a derivative or class action and a multiplier on the scale requested here was awarded. *In re Emerson,* 1992 U.S. Dist. LEXIS 20934 (E.D.N.Y.1992), a case cited by plaintiffs' counsel because of its "non-monetary" nature, is in fact a case where a common fund of $7.5 million was created in addition to non-monetary "therapeutic changes in governance of the corporation." Under these circumstances, the court awarded $2,937,500 representing a multiplier of 1.8. In contrast, in *Mokhiber v. Cohn,* 608 F.Supp. 616, the court declined to award attorneys' fees for the non-monetary benefit of "new guidelines and heightened corporate sensitivity" and instead awarded $11,528.33 plus expenses, 1/3 of the calculable monetary benefit attributable to counsel's representation.

In *United Operating Company v. Karnes,* 482 F.Supp. 1029 (S.D.N.Y.1980), where the court determined that the only benefit conferred to the corporation was the non-monetary benefit of ceasing the litigation, a $40,000 fee was awarded on a request of $125,000. No multiplier was awarded. In *Kopet v. Esquire Realty Co.,* 523 F.2d 1005 (2d Cir.1975), another case relied on by plaintiffs' counsel, the Court of Appeals reversed the district court's denial of fees and found the non-monetary benefit of "causing Esquire's management to conduct its future affairs in conformity with legal require-

27. Compare *Mills v. Electric Auto–Lite* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970) (invalidating merger which had been accomplished through use of misleading proxies); *Sprague v. Ticonic Bank,* 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939) (establishing a lien on bank funds which, through principal of stare decisis, created like rights for other depositors not parties to the suite); *Koppel v. Wien* 743 F.2d 129 (2d Cir.1984) (causing withdrawal of proposed amendment to a participation agreement which would have reduced value of participation rights); *Kopet v. Esquire Realty Co.* 523 F.2d 1005 (2d Cir.1975) (identifying securities law violation, giving limited partners right to securities law violation, giving limited partners right to rescind purchases, uncovering certified financial statements which might facilitate partnership's

further recovery); *Lewis v. Anderson* 692 F.2d 1267 (9th Cir.1982) (causing stock option plan to be submitted to shareholders for approval); *Altman v. Central of Georgia Ry. Co.* 188 U.S.App. D.C. 396, 580 F.2d 659 (D.C.Cir.1978) (causing the corporation to declare dividends); *Milstein v. Werner* 58 F.R.D. 544 (S.D.N.Y.1973) (causing alteration of stock purchase plan, which would probably result in substantial financial savings to the corporation); *Whittemore v. Sun Oil Co.* 58 F.R.D. 624 (S.D.N.Y.1973) (making it possible for stockholders to receive dividends and to exercise conversion rights); *Globus, Inc. v. Jaroff* 279 F.Supp. 807, 809 (S.D.N.Y.1968) (cancellation of option agreement which relieved corporation of obligation to issue stock at below-market price and was "an actual, practical benefit in the business sense").

ments" to be substantial and therefore worthy of an award of attorney fees. The fees requested there were approximately $25,000 plus disbursements of less than $500 with no multiplier discussed.

Similarly, in *Whittemore v. Sun Oil Co.*, 58 F.R.D. 624 (S.D.N.Y.1973), the settlement of a derivative action conferred upon preferred shareholders the right to receive dividends and enjoy conversion rights, a "substantial" but "modest" non-monetary benefit according to the court. The court awarded no multiplier and reduced the award of fees from the $130,000 requested to $80,000. Likewise, in *Milstein v. Werner*, 58 F.R.D. 544 (S.D.N.Y. 1973), the primary benefit conferred by the settlement was the alteration of the corporation's stock purchase plan, a benefit about which the court pointed out: "[I]t is undoubtedly true that the modification of the Stock Purchase Plan will produce some substantial monetary benefit to the corporation." Lastly, in *Globus Inc. v. Jaroff*, 279 F.Supp. 807 (S.D.N.Y.1968), attorneys' fees of $5,000, plus disbursements of $326.80 were awarded for cancellation of an option agreement which relieved the corporation of the obligation to issue stock at below-market price, a benefit the court found to be "an actual, practical benefit in the business sense." None of these decisions involving "non-monetary benefits" apply the degree of fee enhancement claimed here.

 The Second Circuit has made clear that in the event that. the lodestar figure is sufficient to compensate counsel, a multiplier need not be used. *Orchano v. Advanced Recovery, Inc., supra.* 107 F.3d at 99. *See also In re Bolar Pharmaceutical Co.*, 966 F.2d 731 (2d Cir.1992) (lodestar presumed to be reasonable). Moreover, the Supreme Court has discouraged and altogether prohibited the use of multipliers in cases involving mandatory fee-shifting under various federal statutes. *Blum*, 465 U.S. at 898–900, 104 S.Ct. at 1548–49 (holding that the special skill and experience of counsel, the quality of representation and the results obtained from

the litigation cannot serve as independent bases for increasing the basic fee award); *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 564–65, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986) (same); *City of Burlington v. Dague*, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992) (holding that risk is not an appropriate basis upon which to enhance an award).[28]

Faced with this paucity of authority, plaintiffs' counsel have relied heavily on out-of-state decisions, particularly unpublished ones of the Delaware Chancery Court. *See Abajian, et al. v. Alaska Air Group, Inc.*, Del.Ch., C.A. No. 11425, (August 19, 1995) (fee of $440,000 multiplied by 2.16); *In re Santa Fe Southern Pacific Corp.*, Del.Ch., C.A. No. 9523 (Feb. 15, 1989) (fee of $200,000 multiplied by 3.75); *Fish v. Fox, et al.*, Del.Ch., C.A. No. 15161 (November 11, 1997) (fee of $135,000 multiplied by 2.85); *In re Arcadian Corp. Shareholders Litig.*, Del.Ch., C.A. No. 15143 (September 10, 1997) (fee of $135,000 multiplied by 2.85); *Kinder v. Auth.* Del.Ch. C.A. No. 1451, Bolic. V.C. (1997) (fee of $61,250 multiplied by 3.67). Indeed, counsel suggests that Delaware law should control the inquiry here, citing a lone decision from the Central District of California. *See Lewis v. Anderson*, 509 F.Supp. 232, 235 (C.D.Cal. 1981). Counsel omits the point that the *Lewis* court acknowledged that it was equally persuasive that Federal law should govern the question. This dictum, at any rate, is not persuasive, as the Court's review and approval of the settlement and fees requested are required under FRCP 23.1 and Local Civil Rule 23.1, and this Circuit has developed the standards to be applied to this important review without any recourse to state law. *See Grinnell I*, 495 F.2d 448; *In re Agent Orange*, 818 F.2d 226. Furthermore, the point is academic as counsel has failed to point out any conflict in the standards articulated by Federal and Delaware law.

Notwithstanding the lack of a decision precisely on point in the context of an equitable fund/substantial benefit case, multipliers remain. common currency in this Circuit. In-

---

**28.** It is important to note that these Supreme Court cases involve attorney's fees in mandatory fee-shifting cases, not common fund cases. As the Second Circuit noted in *Agent Orange*, "equi-

table fund cases may afford courts more leeway in enhancing the lodestar, given the absence of any legislative directive." *Agent Orange*, 818 F.2d at 234 n. 2.

deed, the Court of Appeals specifically contemplated the continued use of multipliers in common fund class action or derivative cases, *see In re Agent Orange, supra,* fn. 28, and labeled "the risk-of-success factor as 'perhaps the foremost' factor to be considered under the second prong of the lodestar analysis." *Id.* at 236 (citing *Grinnell I,* 495 F.2d at 471).

It is well recognized within this circuit, however, that the risk multiplier is problematic. *See, e.g., Trief v. Dun & Bradstreet Corp.,* 840 F.Supp. 277, 283–85; *Maywalt v. Parker & Parsley Petroleum,* 864 F.Supp. 1422, 1437 (S.D.N.Y.1994), *aff'd* 67 F.3d 1072 (2d Cir.1995). The court in *Trief,* for example, emphasized the societal interest against rewarding attorneys for bringing meritless claims, stating that "risk enhancement generates wasteful societal costs by creating identical incentives for the bringing of meritorious and relatively meritless claims." *Id.* at 284 citing *City of Burlington v. Dague,* 112 S.Ct. at 2641–42. Stated otherwise "[t]he problem with risk multipliers . . . is that they tend to reward counsel for bringing actions of dubious merit." *In re Agent Orange,* 818 F.2d at 236. *See also In re Bolar,* 966 F.2d at 732. The antidote to this potential perverse incentive according to the Second Circuit is for the court to "examine closely the nature of the action in order to determine whether, as a matter of public policy, it is the type of case worthy of judicial encouragement." *Id.* at 236.

■ What seemingly emerges from the applicable case law is that the "less objective factors" of *Grinnell I & II* control, namely, contingent fee risk, benefit achieved and complexity of issues, and no additional standards are prescribed in this Circuit for determining the multiplier, if any, to be awarded in a non-common fund such as this. Instead, it appears that the courts must weigh the benefits, though monetarily intangible, and, on the basis of experience, careful analysis and sound judgment, determine the reasonable value of the services of counsel in achieving the result obtained.

■ Turning attention then to the quantum of benefit provided by this settlement, the first part of the Agreement provides for a statement to be included in Texaco's Annual Report for the year 1997 stating that shareholders may receive a copy of the public portion of the Task Force's Annual Report to the Court, prepared pursuant to the Settlement of the *Roberts* Action, by writing to, sending an e-mail to, or calling a toll-free number at, Texaco and requesting a copy. Notwithstanding the excellent work of the Clerk's Office in the District Court, it is often difficult for a lay person to obtain court documents, and that problem is magnified when the effort to obtain timely copies originates by, for example, an out-of-state request made by mail or telephone. Indeed, at the Hearing before the Special Master, shareholder and objectant Glendora attested, from personal experience in these proceedings, to having experienced that problem. The increased access or its expedition is consequently a real benefit both to the inquiring mind and to concerned Texaco shareholders. By requiring the corporation to advise its shareholders of the existence of the Task Force Report and by increasing its availability, the Settlement Agreement has provided further incentive (if any still be required) for achievement of the goals of the Task Force and, in turn, the underlying purposes sought to be achieved in the seminal *Roberts* Settlement Agreement—*i.e.,* to advance the proper interests of the company and its shareholders, as well as sound public policy.

The second component of the Agreement requires the incorporation of the terms of Texaco's "Statement of Equality and Tolerance Objectives" as outlined above into any new contracts Texaco enters into with outside vendors. This provision states that it does not give rise to any third party (*i.e.,* individual shareholder) rights. The settlement agreement thus provides that "[a]ny failure by Texaco to act in accordance with this obligation will not give rise to any cause of action or third party beneficiary right in favor of any person or entity other than Texaco." Importantly, however, Dennis Block, Esq., counsel for Texaco, has acknowledged in his letter dated May 19, 1998, addressed to the Special Master—and the plain language of the clause makes clear—that this provision expressly contemplates that a

shareholders' derivative suit could be brought against Texaco should the corporation fail to live up to its stated obligation to take reasonable steps to enforce, as against vendors who have the provision in their contracts, the principles embodied in the Statement of Equality and Tolerance Objectives (e.g., Texaco's affirmative commitment "to the fullest extent to an environment of inclusion . . . [and] to insure tolerance, respect and dignity for all people").[29]

 Indeed, it is well established that a shareholder derivative action may be pursued for a corporation's failure to enforce its contractual rights. *See, e.g., Podesta v. Pay Television Corp. et al.,* 1981 U.S. Dist. LEXIS 10494 (S.D.N.Y.1981). This also is the rule in Delaware, the state of Texaco's incorporation. As the Chancery Court stated this past year in *International Equity Capital Growth Fund v. Clegg,* 1997 WL 208955, 1997 Del.Ch. LEXIS 59, "a failure of a corporation to assert a legal right . . . may be a breach of duty, and thus a possible basis for a shareholders' derivative action." *Id.* at *7, 1997 WL 208955, at *3, (citing *Mills Acquisition Co. v. MacMillan, Inc.,* 559 A.2d 1261, 1280 (1989)). In *Clegg,* the court found the plaintiff to have standing to bring claims for breach of fiduciary duty arising out of the corporation's failure to enforce its contract with another company. *Id.*

This provision, in my view, created a new obligation on the part of the corporation, one that heretofore had not existed, namely the placement of the "Equality Objectives" in vendors' contracts and empowered the concerned shareholders of Texaco to seek its vindication by means of a derivative claim in the event Texaco failed to act. That, in my view, constituted a real benefit to the corporation and its shareholders in that it will add another dimension to Texaco's committed efforts to provide the fullest possible environment of inclusion both directly and, insofar as relations with affected vendors are concerned, indirectly.[30]

Having examined the quality of the benefit achieved by the Settlement. I find it to be substantial for the stockholders, but not enough to justify the fee enhancement requested. While it cannot be gainsaid that plaintiffs' counsel faced clear risk of loss on their claims under Delaware law, the risk here was not so great (the *Roberts* Action provided a paved path)[31] and the success here achieved, as distinct from the *Roberts* Action precursor, was not so exceptional in itself. Simply put, there is nothing in this case which justifies the use of such a large multiplier.

No case from this Circuit supports the requested enhancement, and the unpublished Delaware decisions relied upon by plaintiffs' counsel, contain no analysis or reasoning to support their application of a given multiplier. As for the reported decisions outside the Circuit, they too fail to support the multiplier requested. *See Bell Atlantic, supra.*[32]

---

29. Mr. Block's forthright expression regarding the availability of such a derivative claim does not, however, in his words, waive "any rights or defenses that Texaco's directors and officers would have in any such suit." That is to say, any derivative action on this issue would be subject to the same shareholder demand requirement, and the same defenses under the Delaware Business Judgment Rule and Texaco's certificate of incorporation, as applied to the instant suit.

30. Plaintiffs' counsel's suggested third benefit— that the cited non-economic advantages obtained are heightened because Texaco's insurer (not the corporation) will pay the fee award—is unpersuasive.

31. *See Grinnell I, supra,* at 471 (considering in determining appropriateness of multiplier whether "related civil actions" have already been instituted by others, and are issues well worn).

32. Indeed, two decisions counsel places heavy reliance on, *Bell Atlantic Corp.* and *In re Caremark,* 698 A.2d 959 (Del. Ch.1996), although outside the Circuit, are nevertheless instructive and highlight the inappropriateness of the multiplier requested here. In *In re Caremark,* where the settlement provided a non-monetary "substantial benefit", *see id.* at 966, the court awarded only a 15% premium over the straight lodestar. Likewise, in *Bell Atlantic,* the Third Circuit affirmed an award of $412,437.19 in fees and expenses for a case that was settled *after* it had been litigated through a motion to dismiss denied on the merits, full discovery, a motion for summary judgment, again decided on the merits, and full trial preparation. Furthermore, the settlement in *Bell Atlantic* established "new procedures" to avoid sales conduct that had been found illegal and had precipitated a costly Pennsylvania Attorney General investigation, required prophylactic action by parent Bell Atlantic and

While the authorities may not support a multiplier of the magnitude requested, that does not mean counsel is entitled to no upwards enhancement under the second prong of the lodestar analysis. In my view, two meaningful benefits were provided by the settlement here crafted; a ready means for shareholders to obtain the Task Force report—and thus scrutinize the work of and compliance with the recommendations of the Task Force—and the creation of an enforceable right on the part of shareholders to secure compliance with the underlying Equality and Fairness goals insofar as Texaco's dealings with contractually bound vendors are concerned.

In light of counsel's procurement of the real benefits adverted to above in the face of highly qualified opposition, an upwards enhancement is, in my view, warranted. This conclusion is bolstered by the Second Circuit's admonition in *In re Agent Orange, supra*, to closely examine the social utility of the type of litigation at issue. Undoubtedly, Class actions can be "powerful tools for justice" where "[t]hey compensate victims of discrimination, provide a means for reforming oppressive governmental institutions and deter wrongful business conduct where individuals, acting alone, would not have the means to sue." *Strength in Numbers*, Wash. Post. April 11, 1998, at A13. *See also* Legal Therapeutics: The "Salvage" Factor in Counsel Fee Awards, 69 Harv.L.Rev. 658, 662–63 (1956). The instant litigation, which sought to improve corporate governance and fulfill shareholders' interests in equal opportunity, passes the test of *In re Agent Orange*.

## CONCLUSION

Cognizant of the foregoing considerations, I recommend that an aggregate fee of $1,000,000, including expenses, be awarded. It should be noted these fees represent the totality of compensation to plaintiffs' counsel, and they will receive no additional remuneration for the time spent in this application for fees, nor for their time spent defending the

settlement if an appeal is prosecuted. That award would produce a multiplier on the order of 1.5 (as contrasted with a requested total award of $1.4 million based on a multiplier of 2.15). The .5 increase in the "lodestar" would recognize the non-monetary advantage achieved in a tangible fashion by plaintiffs' counsel; yet the diminution in the multiplier sought would take into account the scope of benefits earned and the significant countervailing fact that *Roberts* (in which significant counsel fees were previously awarded) not only led the way, but was inherently indispensable to the result here achieved (e.g., without *Roberts* there would have been no Task Force, let alone a Task Force report to be secured by shareholders).

A copy of the documentary materials not previously filed with the Court but provided to the Special Master and cited above, will be filed, together with the transcript of the May 14, 1998 Conference and a signed original of this report, with the Clerk of the Court. A copy of this report is simultaneously being served upon counsel for the parties.

Pursuant to FRCP Rule 53, parties who appeared before the Special Master shall have ten (10) days, plus an additional three (3) days, pursuant to FRCP Rule 6(e), or a total of thirteen (13) working days (see FRCP Rule 6(a)) from the date hereof, to file written objections to this Report. Such objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the Chambers of The Honorable Charles L. Brieant, U.S.D.J., at the United States Courthouse, 300 Quarropas Street, White Plains, New York 10601.

---

all of its subsidiaries—again a new benefit. *See id.* at 1306, 1311–12.

> The instant action was settled *before* any formal discovery has taken place, with one substantive motion having being briefed but never

decided on the merits (other than the motion to confirm the settlement), and yet, the requested fee is more than three times the size of *Bell Atlantic*.